UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA

| | |
|---|---|
| **Firstcom, Inc., a Minnesota corporation,** | Civil No. 06-4582 (DSD / SRN) |
| **Plaintiff,** | |
| v. | **REPORT & RECOMMENDATION** |
| **Qwest Corporation, a Colorado corporation,** | |
| **Defendant.** | |

David E. Wandling, Wandling Law Group, LLC, 5101 Thimsen Ave., Suite 200, Minnetonka, MN 55345, for Plaintiff.

Marianne D. Short, Theresa M. Bevilacqua, and Heather D. Redmond, Dorsey & Whitney LLP, 50 South Sixth Street, Suite 1500, Minneapolis, MN, 55402, for Defendant.

SUSAN RICHARD NELSON, United States Magistrate Judge

This matter comes before the undersigned United States Magistrate Judge on Defendant's Motion To Dismiss (Doc. No. 2). The matter has been referred to the undersigned for a Report and Recommendation pursuant to 28 U.S.C. § 636 and District of Minnesota Local Rule 72.1(a). For the reasons stated below, the Court recommends that the motion be granted.

**I.    FACTUAL AND PROCEDURAL HISTORY**

This action involves two participants in the telecommunications industry, Defendant Qwest Corporation, an Incumbent Local Exchange Carrier ("ILEC"), and Plaintiff Firstcom, Inc., a Competitive Local Exchange Carrier ("CLEC"), which purchased certain telephonic services from Qwest at a discount and then resold them to others. To promote competition, Congress enacted the Telecommunications Act of 1996, which generally required that an ILEC such as Qwest provide to Plaintiff the same pricing and contract terms as it made available to other carriers. The Act required Qwest to file with state public utility commissions the

agreements made with CLECs for approval and public record, thereby permitting other CLECs the means to demand the same terms.

Plaintiff was formerly known as Al Jaffe & Associates, Inc. ("AJA"), a corporation that purchased various assets from another corporation named Firstcom, Inc., which is now dissolved. The prior Firstcom entered into agreements with Qwest in February 2001, but was unable to remain profitable. Accordingly, it ceased its business operations in 2001 and was dissolved in early 2002.

Shareholders of the dissolved corporation then filed an action in federal court in this district in 2004 ("the prior action"). Firstcom, Inc. v. Qwest Corp., No. 04-CV-995. Firstcom alleged a claim for violation of Sections 251 and 252 of the Telecommunications Act of 1996 ("the federal Act") (Count 1), a claim for violation of the Minnesota Telecommunications Act ("the Minnesota Act") (Count 2), a promissory estoppel claim (Count 3), and a claim for fraudulent misrepresentation (Count 4). (Amended Complaint, No. 04-CV-995.)

The district court granted Firstcom's motion to amend its complaint with respect to seeking punitive damages on its claims under Counts 3 and 4 (but not Counts 1 and 2), and denied its motion to amend with respect to adding a claim for negligence. (Order of May 24, 2006, No. 04-CV-995.) The district court later granted Qwest's motion for summary judgment, ruling that the twelve former shareholders of Firstcom lacked standing to bring what the court found to be a derivative action brought on behalf of a dissolved corporation that had sold its rights to maintain the action to AJA. (Order of September 18, 2006, No. 04-CV-995.)

After acquiring the assets of Firstcom, Plaintiff then filed the present action in federal court in November 2006, asserting five causes of action: (1) violation of the federal Telecommunications Act of 1996, (2) violation of the Minnesota Telecommunications Act, (3)

promissory estoppel, (4) fraudulent misrepresentation, and (5) negligence. (Doc. No. 1, ¶¶ 35-55.) Plaintiff asserted that this Court had diversity jurisdiction under Section 1332. (Id. ¶ 3.) Plaintiff also asserted that this Court had federal question jurisdiction under Section 1331 and supplemental jurisdiction under Section 1367. (Id.)

Qwest now moves to dismiss, arguing that all of the claims are time-barred under a two-year federal statute of limitation and that, in any event, the Complaint fails to plead a cognizable cause of action under the federal Act, under the Minnesota Act, for promissory estoppel or for negligence.

## II.     DISCUSSION

Qwest contends that all of the claims should be dismissed based on the federal statute of limitations and further argues that in any event four of the five claims–everything but the state-law fraud claim–should be dismissed for failure to state a claim. The Court takes a somewhat different approach to the issues, but reaches the same result.

### A.     Plaintiff's Federal Claim Is Time-Barred

In its first claim, Plaintiff alleges that "Qwest violated [its] rights to receive the same contractual terms as those provided by Qwest to [Plaintiff's] competitors as said rights are guaranteed by the Telecommunications Act of 1996, including but not limited to 47 U.S.C. §§ 206, 207, 251 and 252." (Doc. No. 1, ¶ 36.)

Sections 251 and 252 generally govern the interconnection agreements between an ILEC and a CLEC. Section 251 imposes certain duties upon telecommunication carriers in general, 47 U.S.C. § 251(a), upon "all local exchange carriers," id. § 251(b), and "[a]dditional obligations" on "incumbent local exchange carriers," id. § 251(c). Section 252 then provides for procedures for the voluntary negotiation of interconnection agreements, 47 U.S.C. § 252(a), the compulsory

arbitration to establish such agreements, id. § 252(b), and the approval of such agreements by state public utility commissions, id. § 252(e).  Section 252 also provides that "[a] local exchange carrier shall make available any interconnection, service, or network element provided under an agreement approved under this section to which it is a party to any other requesting telecommunications carrier upon the same terms and conditions as those provided in the agreement."  47 U.S.C. § 252(i).

### 1. Sections 206 and 207 Create A Private Cause of Action

Defendant contends that Sections 251 and 252 "do not create a private right of action to sue for damages in federal court."  (Mem. at 19.)  In the prior action, the court ruled that neither Section 251 nor Section 252 "provide for a private right to sue for money damages."  (Order of May 24, 2006, No. 04-CV995.)  This Court agrees.

But it is far from clear that Plaintiff would not have a cause of action under Sections 206 and 207, which form part of the same subchapter ("Common Carriers") of Chapter 5 ("Wire or Radio Communication") of Title 47.  Under Section 206, a common carrier "shall be liable to the person or persons injured" by the common carrier having done "any act, matter, or thing in this chapter prohibited or declared to be unlawful" or having not done "any act, matter, or thing in this chapter required to be done."  47 U.S.C. § 206 (emphases added).  Section 207 then provides a cause of action for damages to "[a]ny person claiming to be damaged by any common carrier subject to the provisions of this chapter."  47 U.S.C. § 207 (providing injured person with option of either making a "complaint to the Commission" or bringing "suit for the recovery of damages . . . in any district court of the United States of competent jurisdiction").

Although Defendant concedes that Sections 206 and 207 "provide rights of action for 'any person damaged by' a common carrier's violation of the Communication Act of 1934," it

4

argues that those provisions protect "only *consumers* from an ILEC's violation," and do not provide "a private right of action for a CLEC (such as plaintiff)." (Mem. at 20.)

The United States Supreme Court, however, recently has ruled that Section 207 "authorizes" a "federal-court lawsuit" by a payphone service provider against a long-distance carrier for damages due to the carrier's refusal to pay the compensation that a Federal Communications Commission order says the provider owes under Section 201(b) of the federal Act. Global Crossing Telecommunications, Inc. v. Metrophones Telecommunications, Inc., ___ U.S. ___, 127 S. Ct. 1513, 1516 (2007). The Court did not limit Section 207 to actions by consumers.[1]

Rather, the Court's analysis was phrased broadly in terms of the various requirements and prohibitions imposed by Chapter 5. The Court noted that Section 206 "says that a common carrier is 'liable' for '*damages* sustained in consequence of' the carrier's doing '*any act, matter, or thing in this chapter* prohibited or declared to be unlawful." Id. at ___, 127 S. Ct. at 1519 (emphases in original). Accordingly, there was a cause of action for violations of Section 201(b) because that section "declares '*unlawful*' any common-carrier 'charge, *practice*, classification, or regulation *that is unjust or unreasonable*.'" Id. at ___, 127 S. Ct. at 1519 (emphases in original). The same reasoning would seem to apply to violations of Sections 251 and 252, which likewise impose certain obligations on, and prohibit certain activities of, telecommunications carriers.

### 2. The Federal Act Imposes A Two-Year Limitations Period

But insofar as there might be any remaining question of whether Global Crossing would

---

[1] The Supreme Court imposed no apparent restriction on such causes of action that would limit them to individual consumers to the exclusion of such entities as Plaintiff here. See id. at ___, 127 S. Ct. at 1519 (noting that history of the statutory provisions makes "clear [that] the purpose of § 207 is to allow persons injured by § 201(b) violations to bring federal-court damages actions").

authorize the present suit, this Court need not decide that issue as any such claim would be time barred.  Under the federal Act, a two-year limitations period applies to certain specified types of claims: (a) "[a]ll actions at law by carriers for recovery of their lawful charges, or any part thereof"; (b) "[a]ll complaints against carriers for the recovery of damages not based on overcharges"; and (c) "[f]or recovery of overcharges action[s] at law."  47 U.S.C. § 415(a)-(c).

Plaintiff's federal claim–seeking damages due to Qwest's failure to provide the same contractual terms as provided to Plaintiff's competitors–would appear to fall within subsection (b) or (c), both of which impose a two year limitations period.  Plaintiff states that "[b]eginning in the fall and winter of 2002 representatives of Firstcom first became aware of various improper, illegal, and anti-competitive conduct by Qwest in relation to its business dealings with CLEC's generally, and Firstcom specifically."  (Doc. No. 1, ¶ 23; accord Mem. at 7.)  Accordingly, the two-year period would have run at the end of 2004 (or in early 2005 at the latest) but Plaintiff did not file the present suit until November 2006.

### 3.     There Is No Basis To Apply Equitable Tolling

Plaintiff appears to concede that his federal claim (Count I) would be subject to the two-year statute of limitations provided in Section 415, but contends that equitable tolling should permit the present action.  (Mem. at 24 (arguing that all five of its claims, including the count predicated on the federal Act, are "timely given the tolling of the limitations period").)

Defendant contends that there is no basis for equitable tolling here.  (Reply Mem. at 8-11.)  This Court agrees.  The doctrine of equitable tolling "does not apply to 'garden variety' claims of excusable neglect" and "should be invoked only in exceptional circumstances."  T.L. v. United States, 443 F.3d 956, 963 (8th Cir. 2006).  Here, Plaintiff and its related predecessors knew of the existence of the alleged injury and its cause no later than late 2002 and thus the

correct entity that owned the cause of action should have filed suit within two years. Accordingly, Plaintiff's claim based on the federal Act should be dismissed.

     **B.**    **There Is No Private Cause of Action To Support Plaintiff's State Statutory Claim**

Qwest likewise claims that the Minnesota Telecommunications Act does not create a private cause of action in favor of Plaintiff. (Mem. at 21-22.) Plaintiff alleged that "Qwest willfully and intentionally violated [its] rights to receive the same contractual terms as those provided by Qwest to [Plaintiff's] competitors as said rights are guaranteed by the Minnesota Telecommunications Act, Minn. Stat. § 237.01 et seq." (Doc. No. 1, ¶ 39.)

In the prior action, the court found "no private cause of action created under the Minnesota Act for a complaining CLEC to seek money damages for an alleged violation of the Act." (Order of May 24, 2006, No. 04-CV-995, at 7.) Rather, the state statute provides only "for civil enforcement proceedings" by the State to pursue "civil penalties" payable to the State. (Id.) "The civil penalties are not awarded to private citizens." (Id.) This Court agrees.

Section 237.461, entitled "Enforcement," established a mechanism for enforcing Chapter 237 and the "rules and orders of the commission" and also provided for penalties for such violations (payable "into the state treasury") to be "recovered by a civil action brought by the attorney general in the name of the state." Minn. Stat. § 237.461, subds. 1, 2, 4.[2] Subdivision 3 similarly provided for penalties (again payable to the state) for violations of certain provisions of Section 237.462. Id., subd. 3. But the state statute does not create a private cause of action for damages.

Section 237.462, entitled "Competitive enforcement; administrative penalty orders,"

---

[2] Some of the provisions of Section 237.461 and Section 237.462 have since expired.

generally authorized the state commission to issue penalty orders. Minn. Stat. § 237.462. Subdivision 8 authorized the state attorney general "to enforce and collect penalties that are due and payable under" Section 237.462. Id., subd. 8. Although Subdivision 11 provided that Section 237.462 did not affect "the ability of a telephone company, telecommunications provider, telecommunications carrier or subscriber to bring a private cause of action in court against a provider of local exchange telephone service based on conduct for which a penalty is imposed under this section," it did not create a statutory cause of action for damages. Id., subd. 11. Rather, Subdivision 11 is a savings clause, providing that the statutory administrative penalty scheme of Chapter 237 does not preempt other existing claims.

In sum, Count II of Plaintiff's Complaint–seeking to premise a private cause of action for damages on Chapter 237–must be dismissed.

**C.  Plaintiff's Remaining Claims Based On State Common Law Are Preempted**

Plaintiff's three remaining claims are based on state common law. Because each seeks recovery of damages for alleged wrongs governed exclusively by the federal Act, they must be dismissed as preempted.

Defendant argues that the two-year statute of limitations applies not only to Plaintiff's claim based on the federal Act but also to its remaining four causes of action based on state law. (Mem. at 8.) Plaintiff contends, however, that his four claims based on state law should be subject to the six-year statute of limitations provided by Minnesota law. (Mem. at 13-23.)

As discussed above, Section 415 provides for a two-year limitations period for certain types of claims. 47 U.S.C. § 415(a)-(c). But the issue with respect to the state common law claims is not best approached in terms of whether the federal statute of limitations also applies to such state-law claims. Because the Erie doctrine generally commands that federal courts apply

state substantive law in diversity actions, a cause of action under state law is, of course, governed by the applicable state law limitations period, even when such a claim is heard in federal court. E.g. Great Plains Trust Co. v. Union Pac. R.R., ___ F.3d ___, 2007 WL 1855643 (8th Cir. 2007).[3]

Qwest nevertheless contends that all of Plaintiff's "claims are predicated on federal law and that the federal Act's statute of limitations, 47 U.S.C. § 415, governs." (Mem. at 14.) Qwest insists that "Plaintiff's claims all depend on and are intertwined with the federal Act's requirements to file interconnection agreements." (Id.) Qwest asserts that "Plaintiff's state law claims all turn on the allegation that Qwest knowingly and intentionally failed to comply with the federal Act's filing requirement" and "[t]o evaluate plaintiff's claims, the Court inevitably will be required to look, to the Act to determine the scope of Qwest's obligations under Sections 251 and 252." (Mem. at 16.)[4]

---

[3] Qwest relies on a variety of decisions by state public utility commissions and a Nebraska federal court decision to support its argument that the federal statute of limitations also applies to state-law claims. (Mem. at 11-13.) But in a similar action, a previous decision from this district concluded that "[n]one of those decisions are biding on this Court, nor are they persuasive." AT&T Communications of the Midwest, Inc. v. Qwest Corporation, 2007 WL 978091, *3 (D. Minn. March 28, 2007) (Davis, J.). As that court noted, "Qwest has not provided the Court any argument or authority to support its position that the federal statute of limitations should apply to state statutory claims that are not preempted." Id. at *2.

[4] Qwest argues that the interconnection agreements "are not ordinary private contracts" but rather "exist only as a result of the federal Act." (Mem. at 9-10.) True enough, but the authorities on which Qwest relies do not directly address, much less support, its argument that a federal statute of limitations governs state-law claims. In Southwestern Bell Tel. Co. v. Connect Communications Corp., 225 F.3d 942 (8th Cir. 2000), the court ruled on a question of federal subject matter jurisdiction, holding that a federal district court has jurisdiction to hear a federal-law claim seeking review of a state utilities commission's determination regarding the meaning of an agreement between telecommunication carriers that had been previously approved by that state commission. Although Qwest contends that "the Eighth Circuit has rejected 'the argument that the interpretation and enforcement of interconnection agreements raises only questions of state contract law'" (Mem. at 12), the Eighth Circuit clearly did not rule that such issues are always governed entirely by federal law. Moreover, the present action does not appear to raise a

But the mere fact that a state law claim requires a court to apply or incorporate some component of federal law does not necessarily mean either that the claim is thus federal, that there is exclusive federal jurisdiction over the claim, or that federal law otherwise applies. See Merrill Dow Pharmaceuticals v. Thompson, 478 U.S. 804, 813-17 (1986) (rejecting argument that state law negligence per se claim actually arises under federal law simply because federal law provided the standard of care).

Nonetheless, it is true, as Qwest argues, that all of Plaintiff's claims–including those based on state law–are premised on the basic underlying allegation that Qwest failed to adhere to the requirement–imposed by federal law–that it not discriminate between Plaintiff and its competitors. (Mem. at 16.) Qwest's argument that the federal limitations period applies is best understood to be (although perhaps not expressly identified as such) that the federal statute preempts state law, particularly the state limitations period. Qwest's argument is also somewhat akin to the removal doctrines of "artful pleading" or "complete preemption," under which a claim pled solely in terms of state law may nevertheless be removed to federal court because federal law provides the exclusive cause of action for such relief. (See Mem. at 16 (characterizing as "artful pleading" Plaintiff's "attempt to re-cast its federal claim as several state claims").)[5]

---

genuine issue of "the interpretation and enforcement of interconnection agreements." The issue here is not the meaning of the agreement that the parties did enter, but whether federal law required Qwest to enter a different agreement with Plaintiff and whether not doing so permits Plaintiff to pursue state-law claims as well as a federal statutory claim, that generally allege that Qwest should have entered a different agreement.

[5] Here, of course, Plaintiff did not file in state court or plead only state law claims. Rather, Plaintiff's Complaint, filed originally in federal court, includes a federal statutory claim and expressly premises federal jurisdiction (at least in part) on this federal question. Thus, Plaintiff is not attempting to evade federal jurisdiction over what would be an exclusively federal cause of action, which is the problem sought to be remedied by these doctrines.

For example, Qwest relies on <u>Cahnmann v. Sprint Corp.</u>, 133 F.3d 484 (7th Cir. 1998) (Posner, C.J.), to support its argument that "notwithstanding plaintiff's attempt to re-cast its federal claim as several state claims, it nevertheless remains that the Court must look to Section 415 to determine whether the plaintiff's claims are barred by the statute of limitations." (Mem. at 16-17.) In <u>Cahnmann</u>, the court faced an issue of removal jurisdiction where a customer brought suit in state court against a telecommunications provider, alleging only state law claims for breach of contract and fraud. The Seventh Circuit upheld removal, concluding that the Federal Communications Act provided the exclusive remedy such that the customer could not pursue relief under state common law.

The court rejected the argument that the federal Act's savings clause preserved the customer's state law remedies. <u>Id.</u> at 488. The Act's general savings clause, Section 414 (which immediately precedes the limitations provision of Section 415), provides that "[n]othing in this chapter contained shall in any way abridge or alter the remedies now existing at common law or by statute, but the provisions of this chapter are in addition to such remedies." 47 U.S.C. § 414. Although the Seventh Circuit recognized that Section 414 "is broadly written," the court noted that "if it were interpreted literally as permitting a state-law breach of contracts suit regarding a tariffed service it would impair the Act's policy of confining telecommunications common carriers to tariffed services and vesting the FCC with primary jurisdiction to determine the validity of tariffs." <u>Id.</u>

The court then proceeded to determine that "the federal Act extinguishes the right to bring a suit for breach of contract under state law when the effect of the suit would be to challenge a tariff." <u>Id.</u> Thus, the customer's claim–although pled solely in terms of a state-law breach-of-contract action–was actually a "suit to invalidate [the tariff] as unreasonable under

federal law" and therefore arose solely under federal law.  Id.  "And since the federal regulation defines the entire contractual relation between the parties, there is no contractual undertaking left over that state law might enforce.  Federal law does not merely create a right; it occupies the whole field, displacing state law."  Id. at 489.  Accordingly, the court upheld the removal to federal court under the "artful pleading" doctrine:  "If a claim can arise only under federal law, because federal law has extinguished the state law basis under which it might otherwise arise, the case is removable to federal court even if the plaintiff sedulously avoids mention of federal law in his complaint."  Id. at 490.

   Here, of course, Plaintiff has pled no claim for breach of contract.  Rather, its state common law claims are for fraud, promissory estoppel and negligence.  Moreover, there is no jurisdictional issue of removal here, as Plaintiff filed originally in federal court and included a federal question claim in addition to its state law claims.  Nonetheless, the basic question here is largely the same as it is in the removal context: does the federal statute occupy the field to the exclusion of state law such that the state common law claims must be dismissed as displaced by the federal claim (as opposed to being transformed into federal claims so as to support federal removal jurisdiction)?

   The Cahnmann court then turned to the fraud claims raised by the customer in addition to its breach of contract claim.  The essence of those claims–which were brought "under several Illinois fraud and consumer protection statutes as well as under the state's common law of torts"–was that the carrier misrepresented the nature of a service to prospective customers.  But the court concluded that "the relief sought by the fraud counts is identical to that sought by the contract count."  Id. at 490.  Accordingly, the court prohibited the plaintiff from pursuing the fraud count because in those circumstances "'fraud' is just another name for 'breach of contract,'

so that to allow the plaintiff . . . to proceed in state court under state fraud law would allow" the tariff to be "set aside, in a suit under state law," which is not allowed under the artful-pleading and filed-rate doctrines.  Id.

The court recognized that the result was harsh, in that it would permit the carrier to make "egregious misrepresentations," but ruled that under Supreme Court precedent "even reasonable reliance on a carrier's representation will not allow a suit complaining about the representation to be litigated under state law if the representation concerns a tariffed service."  Id. (citing Maislan Ind. U.S., Inc. v. Primary Steel, 497 U.S. 116 (1990)).  The court noted that such a plaintiff "would still have a remedy, only under federal rather than state law."  Id.

In Maislan, the Supreme Court addressed the filed rate doctrine under the Interstate Commerce Act (ICA).  Maislan Ind. U.S., Inc. v. Primary Steel, 497 U.S. 116, 119 (1990).  The Court adhered to its almost iron-clad rule that the filed rate must be paid.  Id. at 128 ("Despite the harsh effects of the filed rate doctrine, we have consistently adhered to it.").  As the Supreme Court has since reiterated, the basic principles of the filed-rate doctrine apply equally in the telecommunications context.  American Telephone and Telegraph Co. v. Central Office Telephone, Inc., 524 U.S. 214, 222 (1998) ("Accordingly, the century-old 'filed rate doctrine' associated with the ICA tariff provisions applies to the Communications Act as well.").

In Central Office Telephone, Inc., the Court addressed whether "the federal filed-rate requirements of § 203 pre-empt [plaintiff's state law contract and tort] claims."  Id. at 221.  The Court noted that under that doctrine, "'the rate of the carrier duly filed is the only lawful charge. Deviation from it is not permitted upon any pretext.'"  Id. at 222 (quoting Louisville & Nashville R. Co. v. Maxwell, 237 U.S. 94, 97 (1915)).  "Thus, even if a carrier intentionally misrepresents its rate and a customer relies on the misrepresentation, the carrier cannot be held to the promised

13

rate if it conflicts with the published tariff." Id. (noting that "the file rate doctrine may seem harsh in some circumstances").

Here, of course, Plaintiff alleges that Qwest "misrepresented" its rates and did not inform Plaintiff that it had agreed on better rates with Plaintiff's customers. A claim based on such an allegation seems to be precisely what the Supreme Court nevertheless ruled cannot be pursued under state law. But the Court also noted that the doctrine's "strict application is necessary to 'prevent carriers from intentionally 'misquoting' rates to shippers as a means of offering them rebates or discounts,' the very evil the filing requirement seeks to prevent." Id. at 223. "It is that antidiscriminatory policy which lies at 'the heart of the common carrier section of the Communications Act.'" Id. (quoting MCI Telecommunications Corp. v. American Telephone & Telegraph Co., 512 U.S. 218, 229 (1994)). Here, Plaintiff alleges seemingly similar price discrimination, which suggests that its claim should survive as consistent with the filed-rate doctrine.

But it cannot survive in the form in which it was plead–that is, as a state common law claim. The federal Act still preempts such claims because the federal Act provides a cause of action–the exclusive cause of action–for redressing such discrimination. See Central Office Telephone, 524 U.S. at 226 ("To the extent [plaintiff] is asserting discriminatory treatment, its remedy is to bring suit under § 202 of the Communications Act."); Cahnmann, 133 F.3d at 490 (noting that plaintiff would have a federal claim in lieu of any state claims). Accordingly, Plaintiff would have a single federal remedy for what it has currently denominated as five separate federal and state law claims.[6]

---

[6] But as the Court has already ruled with respect to Plaintiff's claim under the federal Act, that claim is now barred by the two-year statute of limitations. Cf. Central Office Telephone, 524 U.S. at 226 n.1 (holding that judgment for plaintiff based on state law claims that

These principles would preclude Plaintiff's promissory estoppel claim (insofar as it is premised on its "reasonable reliance" on Qwest's alleged assurances "that Firstcom's competitors would not, and did not, receive preferential contract terms") and its negligence claim (insofar as it is premised on Qwest's alleged "duty of care to abide by applicable Federal and state telecommunications laws, to refrain [from] discriminating against Firstcom"). Both of these claims are based at bottom on the allegation that Qwest discriminated against Plaintiff by providing preferential discounts to Plaintiff's competitors despite the mandate of the federal Act that carriers such as Qwest offer the same terms to entities such as Plaintiff. See generally 47 U.S.C. §§ 251, 252.

As the Supreme Court in Central Office Telephone explained, its "analysis applies with equal force to [plaintiff's] tortious interference claim because that is wholly derivative of the contract claim." 524 U.S. at 226. Likewise, Plaintiff's promissory estoppel and negligence claims are derivative of its claim under the federal Act. Moreover, "[t]he saving clause of the Communication Act, § 414 . . . does not dictate a different result. Section 414 copies the saving clause of the ICA, and we have long held that the latter preserves only those rights that are not inconsistent with the statutory filed-tariff requirements." Id. at 227.

Likewise, the Eighth Circuit ruled in MCI Telecommunications Corp. v. Garden State Investment Corp. that the savings clause of Section 414 "preserves causes of action for breaches of duties that are not created under the Communications Act." 981 F.2d 385, 387 (8th Cir. 1992). The duty to not discriminate between customers in terms of discounts–which forms the basis of Plaintiff's three state common law claims–is one of the key provisions of Section 251. 47 U.S.C.

---

Court held were preempted must be reversed where plaintiff unsuccessfully attempted "to add a § 202 claim" under federal law only "well after the 2-year statute of limitations in . . . § 415" had run).

§ 251(b) (imposing duty "not to impose unreasonable or discriminatory conditions or limitations on, the resale of" telecommunications services), § 251(c)(2)(D) (imposing "duty to provide . . . interconnection with the local exchange carrier's network . . . on rates, terms, and conditions that are just, reasonable, and nondiscriminatory"). Accordingly, Plaintiff's common law claims for promissory estoppel and negligence are displaced by the exclusive federal cause of action provided by Section 207 for violations of Sections 251 and 252.

The same principles also extend to Plaintiff's claim for fraudulent misrepresentation. In Cahnmann, the Seventh Circuit drew a distinction between the preemptive scope of the federal Act and the "proper operation" of the "savings provision" as "illustrated by *In re Long Distance Telecommunications Litigation*, 831 F.2d 627, 633-34 (6th Cir. 1987)." Cahnmann, 133 F.3d at 488. The Seventh Circuit stated that in Long Distance Communications, the carrier "was accused of having represented that its rates were lower than a competitor's without revealing that, unlike the competitor, it charged its customers for their uncompleted calls," which the Seventh Circuit characterized as "a claim for simple fraud," the adjudication of which "did not require determining the validity of a tariff." Id. In In re Long Distance Telecommunications Litigation, the Sixth Circuit ruled that the federal Act did not preempt state-law claims of fraud and deceit brought by customers against companies providing long distance telephone services. 831 F.2d 627, 633-34 (6th Cir. 1987) (noting that such claims, "unlike those based on section 201 of the [federal] Act, do not require agency expertise for their treatment").[7]

---

[7] The particular nature of the fraud claim may make a difference. In H.J. Inc. v. Northwestern Bell Telephone, a class of purchasers of telecommunications goods and services from Northwestern Bell brought numerous state statutory and common law claims as well as a RICO claim, alleging "that Northwestern Bell bribed members of the Minnesota Public Utilities Commission for the purpose of influencing the officials in setting telephone rates." 954 F.2d 485, 486 (8th Cir. 1990). The Eighth Circuit rejected the argument that the filed-rate doctrine does not apply to the particular claims of fraud at issue there–that is, "that the doctrine has not

16

Based on the Sixth Circuit's ruling, the Minnesota federal district court in <u>State of Minnesota v. WorldCom, Inc.</u> remanded to state court a suit by the state against the long-distance carrier for allegedly false and deceptive advertisements "in violation of several state trade practice and consumer protection statutes" because such claims presented no federal question. 125 F. Supp. 2d 365, 367 (D. Minn. 2000). There the defendant argued that by "seeking restitution on behalf of Minnesota consumers, the State is trying to alter–after the fact and through litigation–Worldcom's federally filed long distance rates with respect to those consumers." <u>Id.</u> at 368. Worldcom relied in substantial part on the Seventh Circuit's decision in <u>Cahnmann</u>. <u>Id.</u> at 370-71.

But the Minnesota district court found more analogous the Sixth Circuit's decision in <u>Long Distance Communication</u>, which the Seventh Circuit had distinguished in <u>Cahnmann</u>:

> Nothing in the State's action requires a determination of whether the rates Worldcom filed with the FCC are valid or enforceable. The State does not allege that the rates Worldcom charged Minnesota consumers were inconsistent with the rate filed with the FCC. Nor does the State allege that Worldcom's filed rates were improper or unreasonable in light of the services Worldcom actually provided to Minnesota consumers. Furthermore, the State's restitution claim does not implicate the purpose underlying the rate-filing provision of the FCA–<u>the prevention of carriers from 'misquoting" their rates in order to offer some (but not all) consumers a discount or rebate.</u>

<u>Id.</u> at 371-72 (emphasis added). Here, in contrast, the conduct of which Plaintiff complains seems sufficiently analogous to the selective "misquoting" of rates so as to permit price discrimination between customers that the court in <u>State of Minnesota v. WorldCom, Inc.</u> found

---

been applied when the fraud that has been committed is extrinsic fraud or a fraud committed upon the agency itself." 954 F.2d 485, 489 (8th Cir. 1990). Although the court noted that "the Supreme Court has not considered the question of whether the filed rate doctrine applies when plaintiff complains that the regulatory agency itself was involved in the alleged fraudulent conduct," it ruled that "the underlying conduct does not control whether the filed rate doctrine applies." <u>Id.</u> at 489.

would have constituted a state-law claim that would be preempted by the federal Act. Accordingly, Plaintiff's fraud claim must be dismissed here.

In conclusion, each of Plaintiff's common law claims must be dismissed. The Court notes, however, that while federal law preempts state law that would otherwise provide a cause of action for conduct that is within the scope of the federal Act, the scheme envisioned by Congress plainly contemplates a substantial role for state law, state public utility commissions and state courts. E.g. 47 U.S.C. § 251(d)(3) (preserving role for "any regulation, order, or policy of a State commission" that meets certain conditions), id. § 252(a) (providing for submission of interconnection agreements to "the State commission" and for mediation by state commissions of "any differences arising in the course of the negotiation"); Qwest Corp. v. Minnesota Public Utilities Comm'n, 2004 WL 1920970, at *5 (D. Minn. Aug. 25, 2004) (noting that federal Act "preserves state commissions's authority to implement state law that is consistent with the [federal] Act).

This intricate balance and interplay between state and federal authority in this area is perhaps best illustrated by Section 253, which first provides that "[n]o State or local statute or regulation, or . . . other legal requirements, may prohibit or have the effect of prohibiting the ability of any entity to provide any interstate or intrastate telecommunications service," and yet in the next subdivision also provides that

> [n]othing in this section shall affect the ability of a State to impose, on a competitively neutral basis and consistent with section 254 of this section, requirements necessary to preserve and advance universal service, protect the public safety and welfare, ensure the continued quality of telecommunications services, and safeguard the rights of consumers.

47 U.S.C. § 253(a), (b). In short, telecommunications is not a field where Congress has intended simply to preempt all state law.

18

But where Congress has provided an exclusive cause of action for specified conduct, a plaintiff may not premise claims regarding such conduct on state law in addition to federal law. Here, Plaintiff apparently would have had a cause of action under federal law had it filed in a timely fashion, but having failed to do so, it can pursue neither a claim based on federal law nor one based on state law.

## III.   CONCLUSIONS

Plaintiff's federal statutory claim is time-barred. There is no private cause of action for damages under the state telecommunications statutes. Plaintiff's remaining state law claims under common law are preempted by the federal Act and thus also barred.

## IV.   RECOMMENDATION

Based on the foregoing, and all the files, records and proceedings herein, IT IS HEREBY RECOMMENDED that:

1.   Defendant's motion to dismiss (Doc. No. 2) be GRANTED.


Dated: July 30, 2007

                                                  s/ Susan Richard Nelson

                                                SUSAN RICHARD NELSON
                                                United States Magistrate Judge


Under D. Minn. LR 72.2(b), any party may object to this Report and Recommendation by filing with the Clerk of Court and serving all parties by August 14, 2007, a writing which specifically identifies those portions of this Report to which objections are made and the basis of those objections. Failure to comply with this procedure may operate as a forfeiture of the objecting party's right to seek review in the Court of Appeals. This Report and Recommendation does not constitute an order or judgment of the District Court, and it is therefore not appealable to the Court of Appeals.